**CSD 1000** [12/01/03]
Name, Address, Telephone No. & I.D. No.

Andrew Paul Williams
12641 Antioch Rd. Suite #1045
Overland Park KS 66213
(619) 796-6469

FILED

2026 MAY 12 PM 2:46

CLERK
U.S. BANKRUPTCY CT.
SO DIST. OF CALIF.

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re

Williams

Tax I.D.(EIN)#: _____ /S.S.#:XXX-XX-6131    Debtor.

BANKRUPTCY NO. 24-03761-C17
25-90005-CL7
[add if filing in response to hearing]
Date of Hearing: June 8, 2026
Time of Hearing: 10:30 am
Name of Judge: Hon. Christopher B. Lathan

Declaration of Andrew

CSD 1000

2590005 Dcl 38p

Andrew Paul Williams
Defendant, Pro Se
Mailing Address: 12641 Antioch Rd., Suite #1045
Overland Park, KS 66213
Telephone: (619) 796-6469
Email: andrew@carwashmgmt.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* | Bankruptcy Case No. 24-03761-CL 7 |
| | Chapter 7 |
| **ANDREW PAUL WILLIAMS,** | |
| | Adv. Proc. No. 25-90005-CL |
| Debtor. | |
| ———————————————— | **DEFENDANT'S MOTION TO VACATE** |
| | **DEFAULT AND DEFAULT JUDGMENT** |
| **ERIK ANDERSON, NICK ASHTON, and SANDRA ASHTON,** | **PURSUANT TO FED. R. CIV. P 60(b)** |
| | **(Made Applicable by Fed. R. Bankr. P. 9024)** |
| Plaintiffs, | |
| | Hearing Date: June 8, 2026 |
| v. | Hearing Time: 10:30 a.m. |
| | Judge: Hon. Christopher B. Latham |
| **ANDREW PAUL WILLIAMS,** | Dept.: 1, Room 218 |
| | |
| Defendant. | |

## DECLARATION OF ANDREW PAUL WILLIAMS
### IN SUPPORT OF MOTION TO VACATE DEFAULT AND DEFAULT JUDGMENT

I, Andrew Paul Williams, declare:

1.      I am the defendant in the above-captioned adversary proceeding and the debtor in the underlying Chapter 7 bankruptcy case. I have personal knowledge of the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth in this Declaration.

2.      I make this Declaration in support of my Motion to Vacate Default and Default Judgment Pursuant to Federal Rule of Civil Procedure 60(b), filed and served concurrently herewith.

**A. Background and Business Relationship with Plaintiffs.**

3.      I am the founder and Chief Executive Officer of Car Wash Management LLC ("CWM"), a Delaware limited liability company organized to develop and operate car wash facilities.

4.      In or about September-October 2023, I was introduced to Plaintiffs Erik Anderson, Nick Ashton, and Sandra Ashton in connection with their interest in investing in a car wash project. The discussions led to a joint venture in which CWM and the three individual Plaintiffs would together fund the construction of a car wash at 310 South Vincent Avenue, West Covina, California.

5.      The vehicle for the project was "West Covina Car Wash, LLC" ("WCCW"), a Delaware LLC formed for the venture, doing business as "Dam Car Wash."

6.      The terms of the venture were memorialized in an Operating Agreement dated October 26-27, 2023, attached as Exhibit B to Plaintiffs' Adversary Complaint (ECF No. 1). Under the Operating Agreement, CWM took a 70% membership interest in exchange for a $200,000 capital contribution; Erik Anderson took 10% for $66,666; Nick Ashton took 10% for $66,666; and Sandra Ashton took 10% for $66,666. Plaintiffs' collective contribution at the equity level was thus $199,998.

7.    The Operating Agreement attached as Exhibit B to the Complaint is a basic template that the parties signed in October 2023 to permit the venture to commence. Plaintiff Erik Anderson, who is a sophisticated business person, undertook responsibility for drafting a more elaborate operating agreement, working with his own attorney during the venture's formation. That more elaborate agreement was never completed or executed. I expect to produce, in connection with merits litigation, correspondence from Mr. Anderson transmitting his draft of the more elaborate operating agreement.

8.    Section 13 of the Operating Agreement provides: "Any disputes arising from this Agreement shall be resolved through mediation or, if unsuccessful, through binding arbitration in Delaware." Section 12 provides that the Operating Agreement is governed by Delaware law. Plaintiffs did not invoke either mediation or arbitration before filing the State Court Action or this Adversary Complaint.

**B. CWM's Substantial Over-Contribution to the Project.**

9.    CWM in fact contributed approximately **$350,000** to the West Covina project, that is, approximately **$150,000 in excess** of its $200,000 capital commitment, and approximately 175% of the Plaintiffs' combined $200,000 contribution. The detail of those contributions is reflected in CWM's bank statements and in the bank records that Plaintiffs themselves filed with their Motion for Default Judgment as ECF Nos. 12-3 and 12-4.

10.    Plaintiffs' own filings and the Bank of America records they themselves submitted with their Motion for Default Judgment (ECF Nos. 12-3, 12-4) confirm that Sandra Ashton wired $100,000 from her revocable trust on October 30, 2023, and Erik Anderson wired $95,000 on November 21, 2023, for a total of $195,000. The Operating Agreement attached as Exhibit B to the Complaint stated each Plaintiff's equity commitment at $66,666, totaling $199,998. Plaintiffs collectively contributed approximately $4,998 less than their stated equity commitments under the Operating Agreement.

11.    After cost overruns emerged on the project, in or about December 2024, I disclosed a $90,000 cost overrun to all three Plaintiffs in person at a meeting held at Nick Ashton's apartment in the University Towne Centre (UTC) area of La Jolla, California. Mr. Anderson's father, a former Chief Executive Officer of Blue Shield, was also present. All three Plaintiffs and I (on behalf of CWM) attended the meeting. The Plaintiffs expressed concern that further capital contributions by CWM could result in dilution of their respective 10% equity interests, consistent with Section 6 of the Operating Agreement (Non-Diluting Membership Interests), which prohibited dilution of any Member's interest absent unanimous written consent. Mr. Anderson's father proposed that the additional advances CWM would make to WCCW to cover the cost overrun and to permit the project to continue be characterized as loans from CWM to WCCW (rather than additional equity contributions), thereby preserving the existing 70/30 equity allocation under Section

5 of the Operating Agreement. I agreed to that structure on behalf of CWM. Mr. Anderson and Ms. Ashton agreed. Mr. Nick Ashton was vocal in his reluctance about the loan structure but, in order to permit the project to move forward, agreed as well. The parties accordingly agreed that approximately $95,000 of CWM's continuing advances to WCCW would be treated as a loan repayable to CWM. CWM has never been repaid and continues to bear that loss.

**C. The Car Wash Opened and Operated; Sun Day Carwash Continues to Operate Today.**

12.    Paragraph 25 of the Adversary Complaint alleges that the car wash "remains non-operable." That allegation is materially false.

13.    The car wash at 310 South Vincent Avenue, West Covina, **was built**, **did open**, and **did operate** for approximately one to two months in or about May-June 2024. During that period the car wash had business permits, commercial insurance, employees, point-of-sale receipts, credit-card processing transactions, and revenue.

14.    Today, the same car wash facility, at the same address, is operating under the trade name "Sun Day Carwash." Sun Day Carwash maintains a Google business listing showing approximately 70 reviews averaging 4.8 stars; a Yelp business listing; and the City of West Covina's official Instagram account publicly featured Sun Day Carwash in a post dated December 15, 2025. The equipment installed by CWM at the West Covina location is the same equipment Sun Day Carwash is using today.

Screenshots of the public Google listing, Yelp listing, and City of West Covina Instagram post are attached as Exhibit B.

15.    The replacement value of the equipment installed at 310 South Vincent Avenue is approximately $550,000. The funds I and CWM put into the project were converted into tangible, operating equipment that is producing revenue today. Plaintiffs were responsible under the venture for marketing, signage, exterior vinyl wraps, project administrative paperwork, and other launch-related responsibilities. Plaintiffs did not perform any of these obligations. Plaintiffs also collectively underpaid their stated equity commitments by approximately $5,000 (contributing $195,000 against the $199,998 commitment). When CWM later requested that Plaintiffs contribute additional capital to ensure the project could launch successfully, Plaintiffs refused outright. CWM advanced the additional capital itself. Plaintiffs further demanded that CWM shut the project down rather than complete it. Plaintiffs' refusal to perform their assigned non-financial responsibilities, their refusal to fully fund their stated equity commitments, their refusal to contribute additional capital when requested, and their demand that the project be shut down rather than completed substantially contributed to the venture's underperformance during its operating period and to the project's eventual closure.

**D. Bankruptcy Filing; Adversary Complaint.**

16. On October 4, 2024, I filed a voluntary petition for relief under Chapter 7 in this Court (Bankr. Case No. 24-03761-CL7). I was represented in the bankruptcy case by attorney Ronald E. Stadtmueller of San Diego.

17. On the instruction of attorney Stadtmueller, I listed "12136 Avenida Sivrita, San Diego, CA" as my address on the petition. **I did not in fact reside at that address.** That address is my parents' home. I made Mr. Stadtmueller aware of this fact at the time the petition was prepared. Mr. Stadtmueller instructed me to use the address anyway. The correct ZIP code for 12136 Avenida Sivrita is **92128** (Rancho Bernardo).

18. My discharge under Chapter 7 was entered on January 7, 2025. On January 6, 2025, the day before discharge, Plaintiffs filed the Adversary Complaint (ECF No 1). The Summons issued the same day (ECF No. 2).

19. Service of the Summons and Complaint was made by mail on January 7, 2025, to "12136 Avenida Sivrita, San Diego, CA **92121**", the wrong ZIP code. The correct ZIP for the address is 92128. (See ECF Nos. 4, 5, 6-1.) The wrong ZIP appears in every certificate of service in the record. The two ZIP codes correspond to neighborhoods approximately eight miles apart. **ZIP code 92121 used in the certificate of service does not correspond to any address on Avenida Sivrita; rather, ZIP 92121 is the ZIP code of my business mailing address (7776 Trade Street, San Diego, CA 92121).** I did not receive the Summons and Complaint.

**E. Mr. Stadtmueller's Single-Email Abandonment of the Adversary Proceeding.**

20.    Mr. Stadtmueller forwarded the Adversary Complaint to me by a single email. The email read in full as follows:

"Mr. Williams, See the attached Adversary Complaint filed in your case alleging non dischargeability of a debt. As you know my representation does not include defense of any Adversary Proceedings. If you wish to discuss the case and receive a referral to someone who may be willing to represent you in this matter please contact me Wednesday. You must file a timely Answer to the Complaint or the plaintiff will be able to obtain a default judgment. Ron."

21.    I attach to this Declaration as **Exhibit A** a true and correct copy of Mr. Stadtmueller's email. Mr. Stadtmueller never followed up. He did not telephone me. He did not refer me to any specific counsel. He did not file a notice of limited representation in the adversary proceeding. He took no further action of any kind. He did this knowing that I had no other counsel for the adversary proceeding; that he himself had instructed me to list a non-residence address on the bankruptcy petition; that the Complaint had been served by mail to that address; and that I was, at the time, in serious medical and personal crisis.

**F. My Active Medical Crisis During the Response Period, Documented in Contemporaneous Kaiser**

22.    I have been a Kaiser Permanente patient for many years and have an extensive Kaiser medical record. During the period from December 30, 2024 through March 3, 2025, the period spanning, including, and continuing after the response window

for the Adversary Complaint, I had **at least eight medical encounters** with Kaiser Permanente, primarily with the Department of Rheumatology, in active management of an Adult-Onset Still's Disease ("AOSD") flare. Because the underlying records contain extensive private health information substantially exceeding what is necessary for purposes of this Motion, I am lodging the records under seal pursuant to a separately filed Motion to File Documents Under Seal. The summary statements set forth in this Section F are based on those records and are supported by the specific dated entries cited.

23. **Diagnostic baseline.** I was diagnosed with Adult-Onset Still's Disease in February 2017 and have been under active rheumatology care since that time. AOSD is a rare, severe systemic autoimmune disease characterized by recurrent flares of high inflammatory markers, fevers, evanescent rash, severe joint pain, debilitating fatigue, and elevated liver enzymes. The disease can result in multi-organ involvement and typically requires sustained high-dose corticosteroids and biologic immunosuppressant therapy. In my case, AOSD has produced severe, recurrent flares requiring multiple emergency department visits, aggressive intravenous corticosteroid intervention, ongoing biologic immunosuppressant therapy, and Schedule II opioid analgesia for pain management. The disease has had profound and sustained impact on my functional capacity and ability to engage in normal personal and professional activities. (See sealed medical record, Exhibit E.) My

diagnosis and treatment history pre-date the events giving rise to this Adversary Proceeding by approximately seven years.

24.     **Pre-response baseline visit, December 30, 2024. Six days before the Adversary Complaint was filed** (Plaintiffs filed January 6, 2025), I was seen by Dr. Firoozeh Motamedi at Kaiser Rheumatology with daily body aches and pains "like having the flu," as documented in her contemporaneous progress note. I had been experiencing those symptoms for an extended period. The note documents that I described feeling "lethargic and as if [I'd] been hit by a bus upon waking," and significantly worse after exertion. The treatment plan documented at that visit included ordering inflammatory labs and considering a switch to another biologic such as canakinumab or tocilizumab. (See sealed medical record, Exhibit E [12/30/2024 Office Visit, Motamedi].)

25.     **January 30, 2025, Emergency Department, Kaiser San Diego Medical Center.** On January 30, 2025, within the response period, I presented to the Kaiser ED with whole-body urticarial rash, fatigue, weakness, and severe joint pain that I described to the treating physician as feeling "like being hit by a bus," with difficulty breathing on movement. The treating physician (Dr. K.L. Welker Cassius) diagnosed an AOSD flare, in consultation with rheumatology (Dr. Motamedi). My objective laboratory values demonstrated severe systemic inflammation: **C-reactive protein (CRP) 124.1 mg/L (reference ≤7.4)**; white blood cell count 12.6 (elevated); tachycardia 100-109 beats per minute. I was prescribed **high-dose oral prednisone**

(60 mg daily for seven days) and discharged to follow up with rheumatology. (See sealed medical record, Exhibit E [1/30/2025 ED records].)

26.    **February 2, 2025, Second Emergency Department Visit.** Three days later, on February 2, 2025, three days before my answer was due, I returned to the Kaiser ED with throat swelling, the sensation of throat closing, brief difficulty breathing, ongoing myalgias, fatigue, and generalized weakness. The treating physician (Dr. M.B. Del Valle), in consultation with rheumatology, administered **intravenous Solu-Medrol (methylprednisolone 250 mg)**, a high-dose intravenous corticosteroid; intravenous Toradol (ketorolac); and **oxycodone-acetaminophen (Percocet)** for pain. Objective laboratory values continued to show severe inflammation: CRP 109.6 mg/L; ESR 38 (elevated). I was discharged on a Schedule II opioid prescription with a referral to rheumatology the next day. (See sealed medical record, Exhibit E [2/2/2025 ED records].)

27.    **February 3, 2025, Rheumatology Video Visit, Dr. Liu.** The day after the second ED visit, I was seen by Kaiser Rheumatologist Dr. Paul Y. Liu by video. Dr. Liu's progress note confirms the AOSD flare, increases my prednisone to **80 mg daily** with a structured taper, initiates **tocilizumab (Actemra) injectable biologic therapy** every two weeks, and continues my Percocet prescription "as needed for pain." The note documents that I was "diffuse[ly]" rashed, with continued symptoms. Dr. Liu also documents that I had been seen at the ED twice within the prior four days. (See sealed medical record, Exhibit E [2/3/2025 Liu video visit].)

28. **February 10, 2025, Rheumatology Office Visit, Dr. Motamedi, TREATING PHYSICIAN'S WORK-RESTRICTION NOTE.** On February 10, 2025, five days after my answer was due, and eight days before the Clerk's entry of default, I was seen in person by Dr. Motamedi. Her progress note records that I described to her: severe joint pain moving from joint to joint, recent significant pain in the left second PIP and left ankle, muscle cramping throughout my body, difficulty controlling body temperature with night sweats and chills, a rash that comes and goes, difficulty swallowing, lack of appetite, and weight loss of 10-12 pounds. My objective labs at that visit showed: WBC 18.4 (elevated, with leukocytosis); CRP 40.49 (elevated; reference $\leq 7.4$); ESR 52 (elevated; reference 0-15); ALT 116 (elevated; reference $\leq 55$). The Plan section of Dr. Motamedi's progress note expressly documents:

**"Work Limitations** Patient reports difficulty with daily activities and work due to symptoms. **-Provide work restriction note for 4 weeks."**

29. **I emphasize this finding.** On February 10, 2025, five days after my answer in the Adversary Proceeding was due, my treating rheumatologist of long standing made a contemporaneous, signed, and dated medical determination that I had **"difficulty with daily activities and work due to symptoms"** and prescribed a **four-week work restriction**. That determination, embedded in a treating physician's contemporaneous progress note, is independent of any retrospective evaluation and

is supported by objective laboratory values reflecting active severe systemic inflammation.

30. **February 12, 2025, Rheumatology Telephone Visit, Dr. Motamedi.** Two days later, Dr. Motamedi spoke with me by telephone. Her progress note documents: "Patient is on prednisone 80 mg daily, he continues to have diffuse myalgias and arthralgias, **hard to get out of the bed and hard to walk**." My self-reported Percocet use was "1-2 Percocet per day for joint pain." Continued ALT elevation and leukocytosis (WBC 18,000 on prednisone) are documented. (See sealed medical record, Exhibit E [2/12/2025 Motamedi telephone visit].)

31. **February 18, 2025, Clerk's entry of default issued.** (See ECF No. 7.)

32. **Continuing care after default.** On February 25, 2025, Dr. Motamedi's office contacted me by telephone. On March 3, 2025, I had a Hospital Outpatient Visit at Kaiser. (See sealed medical record, Exhibit E [2/25/2025 Motamedi telephone; 3/3/2025 outpatient visit].) My active rheumatology management of this AOSD flare continued throughout this period.

33. **Medication regimen during the response period.** From the February 2, 2025 ED discharge through and beyond the entry of default on February 18, 2025, my documented active medication regimen included: (a) **high-dose prednisone (80 mg daily)**; (b) **tocilizumab (Actemra) 162 mg subcutaneous injection every two weeks** (initiated 2/3/2025); (c) **oxycodone-acetaminophen (Percocet) 5-325 mg,**

taken at ~1-2 tablets per day for joint pain; (d) Bactrim DS three times weekly (later discontinued by Dr. Motamedi due to elevated liver enzymes); and (e) Dupixent injectable. This regimen consists of a high-dose oral corticosteroid, a biologic immunosuppressant, and a Schedule II opioid analgesic, each of which independently produces fatigue, cognitive effects, and impaired functional capacity.

34. **Chronic psychiatric baseline.** Independent of the AOSD flare, I have a long history of severe major depressive disorder, chronic post-traumatic stress disorder, and an anxiety disorder, documented in Kaiser psychiatric records. My Kaiser records reflect Behavioral Health Indicator scores in the severe range (80-89) and PHQ-9 scores in the severe major depression range (17-22) **as far back as November 2021.** My present diagnoses, confirmed by Dr. Reshma G. Bhat, M.D., are: Major Depressive Disorder, Recurrent Episode, Severe (DSM-5 / ICD-10 F33.2); Chronic Posttraumatic Stress Disorder (F43.12); and Anxiety Disorder, Other Specified (F41.8). My treating psychiatrist also contemporaneously documented avoidance behaviors that materially affected my functional capacity during the response period. The specific clinical observations and their documented relationship to the symptoms of my diagnosed conditions are set forth in the sealed Exhibit E and are not described in further detail on the public record.

35. **Personal circumstances.** During this period, I had no stable residence following the failure of the West Covina venture and the collapse of CWM's revenue. I did not reside at the parents' address listed on my petition. I did not have regular and

reliable access to mail at any one location. In December 2024, my father suffered a heart attack, and his recovery and ongoing care consumed substantial portions of my time and emotional resources during the response period.

36. **Combined effect.** The combination of (i) two Emergency Department visits during the answer period (1/30/25 and 2/2/25); (ii) intravenous high-dose corticosteroids; (iii) initiation of biologic immunosuppressant therapy; (iv) Schedule II opioid analgesia; (v) **a treating-physician work restriction note dated February 10, 2025 covering a four-week period**, that is, the period spanning the entry of default on February 18, 2025; (vi) chronic severe major depressive disorder and chronic PTSD documented at Kaiser back to 2021; (vii) homelessness; (viii) my father's recent cardiac event; and (ix) abandonment of the adversary case by my bankruptcy counsel through a single email and no follow-up, **rendered me functionally incapable of recognizing, processing, and responding to legal process** mailed to a non-residence address with the wrong ZIP code during the response period. I did not appreciate, in real time, that an Adversary Proceeding had been initiated, that I was unrepresented in it, that an answer was due, that default had been entered, or that judgment had been entered.

36A. **Convergence of crisis facts during the response period.** I want the Court to understand the convergence of these facts during the response period. I was not merely unwell. Simultaneously, I was: (a) under active emergency hospital care twice within four days for a life-threatening autoimmune flare; (b) initiating biologic immunosuppression

therapy with a Schedule II opioid for pain control; (c) on a four-week treating-physician work restriction; (d) carrying long-documented severe Major Depressive Disorder, chronic PTSD, and an Anxiety Disorder, the full clinical detail of which is set forth in the sealed Exhibit E; (e) without stable housing; (f) watching the West Covina venture, Car Wash Management, LLC's revenue, and my own business reputation collapse in real time, with vendors and customers actively pursuing me and my company for payments and answers I could not provide; (g) responding to my father's recent cardiac event and his ongoing recovery; and (h) abandoned in the Adversary Proceeding by my bankruptcy counsel through a single email and no follow-up. The fair characterization of my circumstances during the response period is not that I was unwell; it is that I was in a documented, acute, life-threatening medical and psychiatric crisis, occurring simultaneously with the collapse of my business and the loss of stable housing, while pro se and effectively abandoned by counsel. No reasonable factfinder could conclude that an individual in those circumstances had the practical capacity to identify, process, and respond to an Adversary Complaint mailed to a non-residence address with the wrong ZIP code. The medical and clinical facts are detailed above and in the sealed Exhibit E.

### G. When I Learned of the Default Judgment; This Motion.

37.     I did not have meaningful actual notice of the default judgment until **March 2026,** when Plaintiffs commenced post-judgment collection by filing the Application for Examination, Abstract of Judgment, and Request for Issuance of Writ of Execution (ECF Nos. 19-22), and the Writ of Execution issued March 30, 2026 (ECF No. 28).

38. Promptly after I came on actual notice of the judgment, I began to gather evidence, locate and review the docket, identify legal grounds, and prepare this Motion. Given my pro se status, the volume of the record, the medical and personal circumstances I have described, and the time required to obtain corroborating evidence, the time elapsed between actual notice and filing of this Motion is reasonable.

39. I have filed this Motion within one year of the entry of the Amended Default Judgment (ECF No. 17, October 7, 2025), satisfying Federal Rule of Civil Procedure 60(c)(1).

**H. Meritorious Defenses I Will Present If Permitted to Litigate on the Merits.**

40. If permitted to file an answer and litigate on the merits, I will present the following defenses, among others: (a) Plaintiffs' own bank records show CWM contributed approximately $350,000 to the project, approximately 175% of the Plaintiffs' actual cash contribution, conduct fundamentally inconsistent with the scienter required under §523(a)(2)(A); (b) Plaintiffs are sophisticated investors who reviewed and signed the Operating Agreement, with Plaintiff Anderson having undertaken responsibility for drafting a more elaborate operating agreement (working with his own counsel) that was never executed, defeating any unsophisticated-victim narrative or claim of justifiable reliance; (c) Plaintiffs themselves underpaid their stated equity commitments by approximately $5,000; refused to perform their assigned launch responsibilities (marketing, signage, exterior vinyl wraps, project administrative paperwork, and related promotional activities); refused to contribute

additional capital when CWM later requested it despite cost overruns; and demanded that CWM shut the project down rather than complete it, conduct constituting breaches of Plaintiffs' fiduciary duties as members of WCCW under Delaware law (the governing law per Operating Agreement § 12) and substantially contributing to the venture's underperformance and closure; (d) Section 13 of the Operating Agreement requires mediation followed by binding arbitration in Delaware, which Plaintiffs bypassed; (e) Plaintiffs' alleged $195,000 in losses represents capital contributions to WCCW (a separate Delaware LLC), not funds personally obtained by me; to the extent any portion is recoverable as nondischargeable fraud, the analysis must focus on what I personally received, not on Plaintiffs' gross contributions to a separate entity; and (f) the equipment is operating today at the same location as Sun Day Carwash, demonstrating that the funds were converted to productive assets, not dissipated; and (g) Plaintiff Erik Anderson, the lead plaintiff in this proceeding, personally and directly instructed me, in a verbal communication that occurred in the presence of a third party who was then present, not to open the car wash facility at 310 South Vincent Avenue, West Covina, California. Notwithstanding Plaintiffs' express instruction not to open, I completed construction of the facility using primarily my own and CWM's funds (approximately $350,000 of the approximately $550,000 total project spend); the car wash opened; and it continues to operate today under the trade name "Sun Day Carwash." Plaintiffs' present attempt to recharacterize my completion and opening of the project, conduct that was directly contrary to their own express

instruction, as a "willful and malicious injury" under 11 U.S.C. § 523(a)(6) is logically incoherent. A debtor cannot "willfully injure" a creditor by doing precisely what the creditor expressly directed the debtor not to do, where the result was the conversion of the creditor's prior capital contribution into a tangible operating asset rather than a personal benefit to the debtor.

41. If granted leave to answer, I will, within 21 days of the Court's Order, file a verified Answer asserting the foregoing affirmative defenses, together with counterclaims against Plaintiffs for: (a) breach of Section 13 of the Operating Agreement (Plaintiffs' bypassing of the contractually mandated mediation and Delaware arbitration through the filing of the State Court Action and this Adversary Proceeding); (b) breach of Plaintiffs' fiduciary duties as members of WCCW under Delaware law (including Plaintiffs' refusal to perform their assigned launch responsibilities, refusal to contribute additional capital when requested, demand to shut the project down rather than complete it, and underpayment of stated equity commitments by approximately $5,000); and (c) breach of contract for Plaintiffs' failure to perform their non-financial obligations under the venture. I will simultaneously move to compel mediation and binding arbitration in Delaware pursuant to Operating Agreement § 13 and the Federal Arbitration Act, 9 U.S.C. § 4. I will also reserve, and intend to pursue, sanctions under Federal Rule of Bankruptcy Procedure 9011 for Plaintiffs' filings in violation of the Operating Agreement's arbitration clause and for Plaintiffs' material misrepresentation in

Complaint paragraph 25 that the car wash "remains non-operable." My counterclaims will seek all available remedies, including compensatory damages, attorneys' fees and costs, specific performance compelling arbitration, and punitive damages where supported by the evidence.

## I. The May 4, 2026 Court Hearing and Plaintiffs' Counsel's Admission of Non-Service.

42. On May 4, 2026, I appeared in person, pro se, in Department 1, Room 218 of the Jacob Weinberger United States Courthouse, before the Honorable Christopher B. Latham, United States Bankruptcy Judge, for the Judgment Debtor Examination scheduled by this Court's Order to Appear for Examination dated March 25, 2026 (ECF No. 24). Plaintiffs' counsel, Martin A. Eliopulos, did not appear in person; he appeared by telephone. Plaintiffs' counsel did not have a court reporter present, citing his secretary's illness. The hearing was recorded by the Court's digital audio recording system.

43. At that hearing, on the record, I stated to the Court that I had not been served any papers in this matter. Plaintiffs' counsel responded by repeatedly inquiring of the Court, on three separate occasions, with increasing emphasis, how I knew about the hearing, stating in substance: "How did he know about this meeting?"; "I want to know how he knew about this meeting"; and "I really want to know how Mr. Williams knew about this meeting." Plaintiffs' counsel further stated, in substance: "We haven't served him papers yet, how does he know about this meeting?"; and "I don't think we have served him papers yet." A copy of the Court's digital audio

recording of the May 4, 2026 hearing has been requested and will be lodged with the Court as a supplemental exhibit when received; a certified written transcript will follow.

44. The Court did not engage with Plaintiffs' counsel's repeated inquiry into the source of my notice of the hearing. The Court did not address Plaintiffs' counsel's admission of non-service. The Court praised my voluntary appearance, stated on the record that the Court was glad I had shown up, and continued the matter, instructing Plaintiffs' counsel and me to coordinate the rescheduling between ourselves. No testimony was taken. The Court did not set a new examination date. As of the filing of this Motion, no new Order to Appear for Examination has been issued, no new examination date has been set, and Plaintiffs' counsel has not served on me any subpoena, order, or other process related to a continued examination.

45. The events of the May 4, 2026 hearing are directly relevant to this Motion: (a) Plaintiffs' counsel's on-the-record acknowledgment that he had not served the March 25, 2026 Order to Appear (ECF No. 24) prior to the noticed examination corroborates the pattern of defective service that is also reflected in the original 2025 service of process at the wrong ZIP code, and supports the alternative ground for relief under Rule 60(b)(4); (b) the Court's on-the-record acknowledgment of my voluntary appearance evidences my good-faith conduct under Pioneer's fourth factor and Falk's "non-culpable conduct" factor; and (c) no testimony was taken, and the procedural posture of the underlying judgment, the Writ of Execution (ECF

No. 28), the Abstract of Judgment (ECF No. 19), and any related collection activity therefore remains as it was before May 4, 2026, save that the previously-scheduled examination has been continued without date.

## J. Closing.

46.   I respectfully request that the Court vacate the Clerk's Entry of Default (ECF No. 7), the Order on Plaintiffs' Motion for Default Judgment (ECF No. 13), the Default Judgment (ECF No. 15), and the Amended Default Judgment (ECF No. 17), grant me leave to file an Answer, and stay all collection activity pending decision.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____5/12_____, 2026, at _____San   Diego_____.

_____

ANDREW PAUL WILLIAMS

Defendant, Pro Se

## EXHIBITS TO DECLARATION OF ANDREW PAUL WILLIAMS

**Exhibit A:** Email from Ronald E. Stadtmueller forwarding the Adversary Complaint and disclaiming representation.

**Exhibit B:** Screenshots of public Google business listing, Yelp listing, and City of West Covina Instagram post (December 15, 2025) for Sun Day Carwash at 310 S. Vincent Ave., West Covina, CA.

**Exhibit C:** Photographs and videos of the car wash equipment in operation at 310 S. Vincent Ave.

**Exhibit D:** POS receipts, credit-card processing records, and contemporaneous transaction documentation showing the car wash's operation.

**Exhibit E: [FILED UNDER SEAL]** Kaiser Permanente Southern California medical records, including: (1) Office Visit and Progress Note, Dr. F. Motamedi, December 30, 2024 (Rheumatology); (2) Emergency Department records and After Visit Summary, January 30, 2025; (3) Emergency Department records and After Visit Summary, February 2, 2025; (4) Video Visit Progress Note and After Visit Summary, Dr. P. Liu, February 3, 2025 (Rheumatology); (5) Office Visit Progress Note and After Visit Summary, Dr. F. Motamedi, February 10, 2025 (Rheumatology), including the four-week work-restriction directive; (6) Telephone Visit Progress Note and After Visit Summary, Dr. F. Motamedi, February 12, 2025 (Rheumatology); (7) Initial Video Psychiatric Evaluation by Dr. R. Bhat, April 8, 2026, and corresponding After Visit Summary; and (8) historical psychiatric

records and behavioral-health screening data from 2021-2022, including the BHI, PHQ-9, and GAD-7 score history. Lodged separately under the concurrently filed Motion to File Documents Under Seal.

**Exhibit F:** Documentation of father's December 2024 cardiac event.

**Exhibit G:** Third-party declaration(s) of witness(es) to the operation of the car wash.

**Exhibit H:** Email from Plaintiff Erik Anderson transmitting his draft of the Operating Agreement (Gmail message ID 18dd243a80038dd7), to be filed when authenticated.

# EXHIBIT A

## TO DECLARATION OF ANDREW PAUL WILLIAMS
## IN SUPPORT OF MOTION TO VACATE DEFAULT JUDGMENT

**Email from Ronald E. Stadtmueller, Esq.**
**to Andrew Paul Williams**
**Forwarding Adversary Complaint**

*Dated January 6, 2025, at 8:25 P.M.*

*In re Andrew Paul Williams*

Bankruptcy Case No. 24-bk-03761-CL7

Adversary Proceeding No. 25-ap-90005-CL

United States Bankruptcy Court, Southern District of California

# EXHIBIT A

## Email Communication from Ronald E. Stadtmueller, Esq.

| From: | Ronald E. Stadtmueller, Esq. <ronstadtmueller@aol.com> |
|---|---|
| To: | Andrew Paul Williams |
| Date: | Monday, January 6, 2025, at 8:25 P.M. |
| Subject: | FW: 25-90005-CL Complaint |
| Attachment: | AP 25-90005.pdf (Adversary Complaint, ECF No. 1) |

**VERBATIM TEXT OF EMAIL BODY:**

*Mr. Williams,*

*See the attached Adversary Complaint filed in your case alleging non dischargeability of a debt. As you know my representation does not include defense of any Adversary Proceedings. If you wish to discuss the case and receive a referral to someone who may be willing to represent you in this matter please contact me Wednesday.*

*You must file a timely Answer to the Complaint or the plaintiff will be able to obtain a default judgment.*

*Ron*

*Ronald E. Stadtmueller*

*10755 Scripps Poway Pkwy., #370*

*San Diego, CA 92131*

*858-564-9310*

# EXHIBIT A (continued)

## Material Forwarded with Stadtmueller Email — Court NEF

*The following Notice of Electronic Filing ("NEF") issued by the United States Bankruptcy Court for the Southern District of California was forwarded as the body content of the email transmitted by Mr. Stadtmueller. It is reproduced verbatim from the email:*

```
From: info_casb@casb.uscourts.gov <info_casb@casb.uscourts.gov>
Sent: Monday, January 6, 2025 5:45 PM
To: casb_ecf@casb.uscourts.gov
Subject: 25-90005-CL Complaint
```

**U.S. Bankruptcy Court**
**Southern District of California**
**Notice of Electronic Filing**

The following transaction was received from Martin A. Eliopulos entered on 1/6/2025 at 5:45 PM PST and filed on 1/6/2025

Case Name: Anderson et al v. Williams
Case Number: 25-90005-CL
Document Number: 1

Docket Text:
Adversary case 25-90005. Complaint by Erik Anderson, Nick Ashton, Sandra Ashton against Andrew Paul Williams. Nature of Suit: 62 (Dischargeability - 523(a)(2), false pretenses, false representation, actual fraud) 68 (Dischargeability - 523(a)(6), willful and malicious injury), Fee Amount $350.00 Filed by Martin A. Eliopulos on behalf of Erik Anderson, Nick Ashton, Sandra Ashton.

**25-90005-CL Notice will not be electronically mailed to:**
**Andrew Paul Williams**
**12136 Avenida Sivrita**
**San Diego, CA 92121**

## EXHIBIT A (continued)

### Significance and Authentication

### SIGNIFICANCE OF THIS EXHIBIT

1. Abandonment by single email. This email — sent on January 6, 2025, at 8:25 P.M. (approximately two hours and forty minutes after the Adversary Complaint was filed) — constituted the entirety of Mr. Stadtmueller's communication to me regarding the adversary proceeding. Mr. Stadtmueller did not telephone me, send any follow-up correspondence, refer me to specific replacement counsel, or file any notice of limited scope of representation. He thereafter took no further action of any kind regarding the adversary matter.

2. Defective service address in court NEF. The forwarded Notice of Electronic Filing reproduced on the preceding page shows that the United States Bankruptcy Court's own electronic notification system recorded my mailing address with the wrong ZIP code: "San Diego, CA 92121." The correct ZIP code for 12136 Avenida Sivrita is 92128. This same incorrect ZIP code recurs in all subsequent service documents filed by Plaintiffs (ECF Nos. 2, 4, 5, and 6-1). The defective address originated in the court's NEF and was never corrected.

3. Notice not electronically mailed. The NEF expressly states that notice "will not be electronically mailed to" me, and identifies only paper service to the wrong-ZIP address. I had no electronic filing account; service was limited to a single mailing addressed to a non-residence with an incorrect ZIP code.

4. Counsel's actual knowledge. Mr. Stadtmueller received the same NEF, observed the incorrect ZIP code, and was at the time my counsel of record in the underlying bankruptcy. He nonetheless transmitted no further communication to me, took no protective step on my behalf, and made no record-correction effort.

### AUTHENTICATION

The foregoing is a true and correct verbatim copy of the email I received from Ronald E. Stadtmueller, Esq., my former bankruptcy counsel, regarding the adversary complaint filed

against me by Erik Anderson, Nick Ashton, and Sandra Ashton (Adv. No. 25-ap-90005-CL). The email was sent from Mr. Stadtmueller's email address (ronstadtmueller@aol.com) at the time and date stated above. The verbatim text reproduced herein, including the forwarded Notice of Electronic Filing from the United States Bankruptcy Court, is reproduced exactly as it appeared in the email I received. I authenticate this exhibit under penalty of perjury under the laws of the United States as part of my Declaration filed concurrently herewith.

# EXHIBIT B

## TO DECLARATION OF ANDREW PAUL WILLIAMS
## IN SUPPORT OF MOTION TO VACATE DEFAULT JUDGMENT

**Public Record Evidence**
**Sun Day Carwash — Currently Operating at 310 S. Vincent Ave**
**West Covina, California 91790**

*In re Andrew Paul Williams*

Bankruptcy Case No. 24-bk-03761-CL7

Adversary Proceeding No. 25-ap-90005-CL

United States Bankruptcy Court, Southern District of California

# EXHIBIT B

*Public Record Evidence of Operating Car Wash at 310 S. Vincent Ave*

## PURPOSE OF THIS EXHIBIT

This exhibit consists of screenshots and printouts from publicly accessible online sources documenting that a car wash business known as "Sun Day Carwash" is currently operating at 310 South Vincent Avenue, West Covina, California 91790 — the same address at which Car Wash Management, LLC ("CWM") constructed and installed car wash equipment using funds contributed by Plaintiffs Erik Anderson, Nick Ashton, and Sandra Ashton (collectively, "Plaintiffs").

These records directly contradict the central allegation of paragraph 25 of the Adversary Complaint (ECF No. 1) that the car wash "remains non-operable." Plaintiffs' own bank records filed at ECF Nos. 12-3 and 12-4 corroborate the substantial expenditures on equipment that remain installed and in active commercial use at this location.

## CONTENTS OF THIS EXHIBIT:

Tab B-1:  Sun Day Carwash Official Website (sundaycarwash.com) — Locations Page Confirming Operation at 310 S. Vincent Ave

Tab B-2:  City of West Covina Official Instagram Post (December 15, 2025) — Welcoming Sun Day Carwash to the City

Tab B-3:  Google Search Results — Sun Day Carwash Business Listing (84 Google reviews, 4.8 stars, currently open)

Tab B-4:  Instagram Posts (@socalfam.explores) — Interior Photographs of Car Wash Equipment in Operation

## AUTHENTICATION

I authenticate the screenshots contained herein under penalty of perjury under the laws of the United States as part of my Declaration filed concurrently herewith. Each screenshot was

captured by me from the publicly accessible website indicated and is a true and accurate copy of what appeared on that website at the time of capture.

# TAB B-1

## Sun Day Carwash Official Website — Locations Page

*sundaycarwash.com — Confirmation of West Covina Operation at 310 S. Vincent Ave*




SIGNIFICANCE: This is the official corporate website of Sun Day Carwash. It identifies West Covina at 310 South Vincent Avenue, West Covina, CA 91790 as one of their operating locations. This constitutes an admission by the entity currently operating the car wash that it is, in fact, operating at the exact address at which the equipment funded by Plaintiffs' $195,000 contribution and CWM's approximately $350,000 contribution was installed.

Source: sundaycarwash.com (Sun Day Carwash official website)    Date captured: May 12, 2026

# TAB B-2

## City of West Covina Official Instagram Post

*Verified Municipal Account (@westcovinacity) — December 15, 2025*



SIGNIFICANCE: *This post originates from the official, verified municipal Instagram account of the City of West Covina (note the blue verified checkmark next to @westcovinacity). The post, dated December 15, 2025, officially welcomes Sun Day Carwash as a new community sponsor located at 310 South Vincent Avenue, West Covina. This is a governmental confirmation that the car wash at the same address as CWM's installed equipment is operating as an active commercial enterprise.*

*Source: Instagram @westcovinacity (official verified municipal account)    Post date: December 15, 2025    Date captured: May 12, 2026*

# TAB B-3

## Google Search Results — "Sun Day Car Wash West Covina"

*Aggregated Public Listings (Google Business, Yelp, Instagram)*



SIGNIFICANCE: *Google search results aggregate multiple independent public listings confirming active commercial operation: (i) Google Business profile showing 4.8 stars with 84 Google reviews, address 310 S Vincent Ave, West Covina, CA 91790, phone (626) 587-0044, status "Open" with hours "Closes 8 PM"; (ii) Yelp listing "SUN DAY CARWASH - Updated May 2026 - 20 Reviews"; (iii) Instagram video post from @socalfam.explores referencing "Sun Day Car Wash is NOW OPEN in West Covina." Multiple independent sources confirm operational status.*

*Source: Google Search    Date captured: May 12, 2026*

# TAB B-4

## Instagram Posts — Interior of Operating Car Wash at 310 S. Vincent Ave

*Source: @socalfam.explores — Tagged Location: @sundaycarwash*



*First view: Interior of operating car wash facility showing Sun Day Carwash branded entrance arch ("Bright and Shiny") and equipment in active use. Posted with caption "Sun Day Car Wash is NOW OPEN in West Covina!"*

## TAB B-4 (continued)



*Second view: Tunnel interior showing wash bay with Sun Day Carwash overhead signage and operational wash equipment (curtains, sprayers, conveyor visible) — equipment originally installed by CWM at this location.*

*SIGNIFICANCE OF TAB B-4: These photographs depict the interior of the car wash currently operating at 310 South Vincent Avenue. The wash equipment visible — including the tunnel structure, curtain system, and overhead branding integration — represents the same physical infrastructure that was constructed and installed using the approximately $550,000 in combined Plaintiff and CWM funding. The car wash is not "non-operable" as alleged in paragraph 25 of the Complaint; it is operating as an active commercial business under the Sun Day Carwash brand.*

*Source: Instagram @socalfam.explores    Location tag: @sundaycarwash    Date captured: May 12, 2026*